## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **OMAR TORRES SULBARAN,**<br><br>    Plaintiff,<br><br>v.<br><br>**UBER TECHNOLOGIES, INC.,**<br>a Delaware Corporation**;**<br>**and RASIER, LLC,**<br>a Delaware Limited Liability Company**,**<br><br>    Defendants. | **No. 3:26-cv-414**<br><br>**ORIGINAL COMPLAINT**<br><br><br><br>JURY TRIAL DEMAND |

Plaintiff Omar Torres Sulbaran, by and through undersigned counsel, brings this action against Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Uber" or "Defendants"), and alleges as follows:

### I. PARTIES

1. Plaintiff Omar Torres Sulbaran ("Mr. Torres" or "Plaintiff") is an individual and citizen of the State of Wisconsin, residing at 202 Prairie Heights Drive, Verona, Wisconsin 53593.

2. Defendant Uber Technologies, Inc. ("Uber Technologies") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1515 3rd Street, San Francisco, California 94158. Uber Technologies owns, operates, and controls the Uber rideshare platform and is registered to do and conducts substantial business in the State of Wisconsin, including in Dane County.

3. Defendant Rasier, LLC ("Rasier") is a limited liability company organized and existing under the laws of the State of Delaware, and is a wholly-owned subsidiary of Uber Technologies, Inc. Rasier is the entity that contracted directly with Plaintiff Omar Torres Sulbaran pursuant to Driver Platform Agreement. Rasier's principal place of business is 1515 3rd Street, San Francisco, California 94158. Upon information and belief, no member of Rasier, LLC is domiciled in the State of Wisconsin.

4. At all times relevant to this Complaint, Defendants Uber Technologies and Rasier jointly owned, operated, managed, and controlled the Uber rideshare platform, including the Uber Driver App, the Uber Rider App, and the algorithmic matching system that connected Plaintiff with the rider who violently attacked him. Defendants are referred to collectively herein as "Uber" because they operated the platform as a single integrated enterprise, shared officers and management, and exercised joint control over driver and rider operations in Wisconsin.

1

## II. JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Plaintiff Omar Torres Sulbaran is a citizen of the State of Wisconsin. Defendant Uber Technologies, Inc. is incorporated in Delaware with its principal place of business in California. Defendant Rasier, LLC is a Delaware limited liability company with its principal place of business in California. Upon information and belief, no member of Rasier, LLC is a citizen of Wisconsin. Complete diversity of citizenship therefore exists.

7.     The amount in controversy exceeds $75,000, exclusive of interest and costs, in light of the severity of Plaintiff's injuries, including five stab wounds requiring emergency surgery, hospitalization, permanent physical scarring, ongoing physical therapy, lost wages, and severe emotional distress and post-traumatic stress disorder.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred in Dane County, Wisconsin, within the Western District of Wisconsin. The stabbing and carjacking occurred on May 6, 2024, at the Target store located at 4301 Lien Road, Madison, Wisconsin.

## III. FACTUAL ALLEGATIONS

### A. Uber's Business Model, Control Over the Platform, and Representations to Drivers

9.     Uber operates the largest transportation network platform in the United States. Through the Uber Applications, Uber matches drivers with riders for transportation services, sets the fares of ever trip, controls payment for fares on every trip, performs extensive and complex analysis of dangers associated with the platform, markets extensively to both Uber Drivers and Uber Riders, requires Uber Driver trainings, manages interpersonal conflicts on the system, performs pre-trip risk analysis of the potential pairing between Uber Driver and Rider, investigates violations that occur on the Uber Platform, and, amongst many other things, decides the Users who are eligible to operate on the Uber Platform.

10.     Uber is a transportation network platform that provides millions of trips in the United States every day and over a billion trips on its platform every year. Uber has sought, and has been successful, in turning their platform into a Verb – billions of people worldwide "Uber" in order to get from point A to point B. Uber has sought, and has succeeded, in being a form of transportation that has permeated society in the United States and is the most used transportation platform in the United States. The choices that the Defendants make relating to safety on the Defendants' platform are of extreme importance to the people of the United States and the Defendants conduct causes serious harm to the public, including the Plaintiff. The Defendants' knowing disregard for public safety must not continue.

11.     This is not a case involving an ordinary commercial dispute between sophisticated parties. The Plaintiff was violently assaulted while performing transportation services on Uber's Platform — services that Uber holds out to the public as safe, regulated, and accountable. The claims in this

2

action arise from Uber's knowing failure to address a documented, nationwide pattern of carjackings and violent physical assaults targeting Uber. Additionally, Uber Riders also are the victims of a nationwide pattern of violence, including murders, catastrophic physical attacks, and sexual assaults.

12.    Uber's own Safety Reports — published by Uber itself — document thousands of physical assault incidents occurring on its Platform over multiple reporting periods. By the 2021–2022 reporting period, Uber drivers had become the primary victims of fatal violence on Uber's Platform, accounting for 61% of fatal physical assault victims. Uber was not blindsided by the violence directed at the Plaintiff; it had catalogued, analyzed, and internally reported on this precise category of harm for years before the assault on Plaintiff Torres occurred.

13.    Uber's business model depends entirely on drivers like the Plaintiff accepting ride requests from strangers assigned to them by Uber's algorithmic matching system. Unlike traditional taxi services, Uber prohibits street hailing — meaning Uber retains exclusive control over the process of matching drivers with riders, and drivers have no ability to independently solicit Uber trips. Likewise, Driver's cannot build a book of business through the Uber Driver App, as a private driver for-hire would be able to build. Every ride taken through the Uber Platform is a ride that Uber chooses to facilitate through its control over the users of the platform.

14.    Uber presents itself to its drivers and riders as a safe, vetted, and technology-driven transportation service. Uber's marketing materials, in-app communications, and driver onboarding processes consistently represent to drivers that rider accounts are verified, that the Uber Platform is a secure environment, and that Uber takes driver safety seriously. Regarding Uber Drivers, Uber has states on its website that it is "committed to connecting you to the safest ride on the road" and that the Uber experience has been "designed from the ground up with your safety in mind." Uber leverages these representations to attract and retain drivers on its Platform.

15.    Despite these representations, Uber's own Platform Access Agreement contains the following disclaimer buried among dozens of pages of boilerplate: "WE DO NOT SCREEN OR EVALUATE THESE RIDERS." This admission directly contradicts Uber's public safety representations, the representations made to the Plaintiff directly, and reveals a central tension in this case: Uber profits from every ride completed on its Platform while simultaneously disclaiming responsibility for screening the very riders it assigns to its drivers.

16.    At all relevant times, Uber maintained exclusive and comprehensive control over the digital interface between its drivers and riders, including: (a) the onboarding, identity verification, and account creation process for riders; (b) the algorithmic matching system by which specific riders are assigned to specific drivers; (c) the information made available to drivers about assigned riders; (d) what verification steps, if any, are required before a rider account is activated; (e) whether anonymous Riders can take trips on the Uber System without additional identity verification; and (f) all in-app safety features available to drivers during rides.

17.    When Plaintiff Torres accepted a ride request, he received only the information Uber chose to provide: an Uber Rider accountholder's first name and a pickup location. He had no access to the rider's full name, government-issued identification, payment method, criminal background, account history, or any other information that might allow him to independently assess the safety of accepting the ride.

3

18.    Pursuant to the Driver Agreement and Uber's operating procedures, Mr. Torres received ride assignments exclusively through the Uber Driver App. Upon accepting a ride request, Mr. Torres was provided with only the information Uber chose to disclose. Mr. Torres had no ability to independently verify the identity, background, account history, or payment method of any rider assigned to him by Uber. Mr. Torres relied on Uber's exclusive control of rider vetting and its representations regarding platform safety.

19.    The occupation of rideshare driver is among the most dangerous in the United States. Uber was at all relevant times aware of this occupational danger. Its own 2019 internal investigation — disclosed in its first Safety Report — found that its drivers were approximately as likely to be victims of fatal physical assault on its Platform as its riders. Despite this knowledge, Uber undertook no measures to warn Mr. Torres of these risks, train him to identify dangerous situations, or provide him with any information about the increased risk of accepting Uber Riders who are not Uber accountholders.

20.    OSHA has for decades recommended that companies providing for-hire transportation employ physical safeguards to protect drivers from passenger assault, including physical partitions between driver and passenger compartments. These measures are simple, inexpensive, and have a well-documented record of effectiveness. Uber controls vehicles approved for use on the Uber App, the approval process for its drivers and, through its Vehicle Marketplace program, directly provides or approves vehicles for drivers' use. Despite this control, Uber has never required partitions in its drivers' vehicles, has never suggested drivers should use a partition for safety, and does not train its drivers to identify dangerous situations or inform them of these protective measures.

21.    Uber penalizes drivers for declining or canceling rides. For example, if a driver declines a certain percentage of ride requests, he or she risks being moved to the bottom of Uber's queue vis-a-vis other drivers for ride requests in a busy area, such as an airport. Drivers also risk suspension or deactivation of their Uber account for declining too many rides.

22.    Uber drivers are provided almost no information about passengers and trip details until after they accept a ride request--just the first name of the passenger, the length of the trip, and the pick-up location. Drivers are not provided with a photo of the passenger. With no photo and no full name, drivers have no way of verifying that the person who requested the ride is actually the person they pick up.

23.    Uber also creates perverse incentives to encourage the maximum number of rides. Uber offers flat bonuses or increased payouts per ride when drivers accept a certain number of rides. Because payouts to drivers are so low in relation to their time and costs, these "bonuses" or increased payouts may be the difference between profitability or not after the driver's expenses are deducted.

24.    Uber further restricts its drivers' ability to exercise independent safety judgment through a system of perverse financial incentives: (a) drivers who decline ride requests are demoted in Uber's ride-assignment queue, reducing their priority access to higher-earning areas; (b) drivers who decline too many rides face suspension or permanent deactivation of their accounts; (c) Uber offers flat bonuses and elevated per-ride payouts contingent on meeting minimum acceptance-rate thresholds — bonuses that are often the difference between profitability and loss given Uber's base payout rates; Uber deploys an incentive program known as Uber Pro that restricts certain

information about the trip to the Uber Driver unless the driver meets certain earning thresholds; (d) before drivers must accept or decline, Uber provides only a first name, star rating, and pickup location — no photograph, no account history, no payment method indicator, and no risk flags — making independent safety assessment impossible even without financial coercion. This system stripped Mr. Torres of the ordinary tools of self-protection that any person would use before voluntarily placing a stranger in their vehicle.

**B. Uber Failes to Utilize its Enormous Technological Capabilities to Screen or Implement Identify and Fraud Checks of New Customers**

25.     Uber does not verify the identity of or screen new passengers for fraud, even though Uber has the technology and ability to do so.

26.     Uber requires prospective Uber drivers to pass background checks before they can begin accepting rides through the Uber application. Uber's 2017–2018 US Safety Report boasts:

> Every US driver undergoes an annual Motor Vehicle Record (MVR) review and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.
>
> …
>
> Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process . . .
>
> Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for **certain serious criminal convictions**—including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping—at any time in the person's history, the potential driver will be disqualified according to our standards.
>
> . . .
>
> Beyond performing annual background check reruns, we were the first US ridesharing company to implement continuous driver screening technology, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than 40,000 drivers have been removed from the app due to continuous screening.[1]

27.     In contrast, prospective passengers are not subject to any form of background check or identity verification process to open an Uber account. Uber does not perform even perfunctory

---

[1] *See* Uber's 201718 U.S. Safety Report, *available at* https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id (emphasis added).

screening of prospective passengers' payment information for fraud or stolen identity. To open an account as a passenger, an individual need only input a phone number, email address, and payment method. Permitted payment methods include credit and debit cards, PayPal, Venmo, digital wallets, and Uber gift cards. Uber allows users to scan or upload a photo of a credit card through the app. This entire process can be completed in a matter of minutes with fabricated information.

28.     Uber has elected not to screen new customers or implement identity checks despite its knowledge that drivers are about as likely as passengers to suffer a fatal physical assault during an Uber ride.[2] Indeed, while Uber recognizes the need for vigorous background checks for drivers, individuals opening a new account are subject to essentially no screening before they get into the same enclosed space with an unprotected driver who has his or her back to the passenger and eyes focused on the road.

29.     The privacy section on Uber's website discloses that it collects individual rider data including the following: name, email address, mobile number, rating(s), and the date signed up with Uber; referral code(s) issued by Uber; payment method information, such as the date the rider created and updated a payment method, the issuing bank's name, billing country, and payment method type; metadata about support conversations with Uber; times and locations at which a trip was requested, started, and ended; distance traveled; trip prices and currency; 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location that the data was collected.

30.     Given Uber's state of the art data triangulation capabilities, it could use data pattern analysis to "red flag" miscreant passengers who are utilizing false or stolen identities or bogus payment information to hire Uber drivers. Instead, Uber has used these capabilities to attempt to thwart its rival Lyft, to evade regulators, and to analyze traffic speeds. It did not, in connection with the events alleged herein, use these capabilities to keep its driver Cherno Ceesay safe from dangerous criminals on its platform.

## C. Uber's Prior Knowledge of Violence Against Drivers — Industry-Wide Pattern of Carjackings

31.     Well before the May 6, 2024 attack on Mr. Torres, Uber had actual and constructive knowledge that drivers on its Platform faced a foreseeable risk of violent assault, carjacking, and attempted homicide at the hands of riders that Uber matched with drivers through its app.

32.     Uber's own publicly released U.S. Safety Reports — covering the periods 2017–2018, 2019–2020, and 2021–2022 — disclose mounting evidence that Uber had actual knowledge of a foreseeable and worsening risk of violent attack against its drivers. Specifically: (a) Uber's 2017–2018 Safety Report disclosed 19 fatal physical assault incidents on the Platform, including 7 driver fatalities; (b) Uber's 2019–2020 Safety Report disclosed 20 fatal physical assault incidents — an 18% increase — and noted that "Third parties were also the accused party in the majority of physical assault fatalities"; (c) Uber's 2021–2022 Safety Report disclosed 36 fatal physical assault incidents, a 96% increase from the prior period. In a critical shift, "61% of fatalities were drivers using the Uber app" — a reversal from prior periods — and "nearly one-third of driver fatalities

---

[2] *Id.*

(32%) were reported to involve motor vehicle theft," directly acknowledging carjacking as a documented cause of driver deaths on the Platform.

33.    Importantly, Uber's Safety Reports do not disclose all of the carjackings of Uber Drivers reported and do not disclose all of the drivers who lost their lives on the Uber platform during from 2017 – 2022. Uber's investigations and reporting of these events rely on their own internal processes which allow for these reports to be invalidated based on its own standard operating procedures. The true rates of carjackings, homicides, and serious physical assaults to drivers have never been disclosed to the public due to Uber's decisions to manipulate the data in Uber's favor based on reporting requirements.

34.    In response to the documented increased carjacking risk, Uber implemented a rider identity verification requirement for users setting up new accounts with anonymous payment methods. Uber's internal analysis of interpersonal conflict (injuries to users) found that anonymity on the Uber platform created an increased risk to Uber drivers of injury. Uber's research indicates that anonymous riders are more likely to commit violent acts on the Uber system.

35.    Uber's own 2019–2020 U.S. Safety Report stated that rider identity verification was designed as "a deterrent to those who are trying to use the app for theft or to harm drivers." By 2021–2022, Uber's Safety Report confirmed that anonymous riders using anonymous payment methods "are required to upload an ID before taking their first trip." Additionally, Uber launched a "verified rider badge" in select U.S. cities — including Atlanta, Baltimore, Chicago, Detroit, and Portland — allowing drivers to see whether a rider's identity had been verified. Madison, Wisconsin was not among the cities where the verified rider badge had been deployed at the time of the attack on Mr. Torres. Moreover, neither anonymous-payment verification nor any other identity control was deployed by Uber here: the ride was booked by William Wideman, a verified account holder, **on behalf of Antonio Rodgers** — a complete stranger to William Wideman. Uber never identified, verified, or disclosed to the Plaintiff that Antonio Rodgers a non-verified rider on the trip that almost ended in the Plaintiff's death.

36.    On information and belief, Antonio Rodgers maintained his own Uber Rider account and had prior reports from Uber Drivers of dangerous activity.  On information and belief, Uber was on actual notice that Antonio Rodgers had previously breached the Uber Rider agreement and had previously breached Uber's internal policies.  Uber knew, prior to the Plaintiff being viciously attacked, that Antonio Rodgers was a risk to users of the Platform. Despite knowing this about Antonio Rodgers, Uber never implemented rules to prevent account sharing that allows Uber Accountholders to book trips for anonymous riders and never informed the Plaintiff that anonymous riders are a danger to him.

37.    Uber had actual, documented notice of the carjacking threat to the Plaintiff and other Uber drivers. The Markup investigative reporting outlet published a longform story that confirmed at least 124 carjackings and attempted carjackings of ride-hail drivers across the United States, with Uber drivers most frequently targeted, and subsequently confirmed more than 350 carjackings of gig workers — including 121 Uber drivers — over five years, with 28 rideshare workers killed. Uber itself produced at least 24,000 internal safety incident reports reflecting alleged physical

assaults against its drivers by passengers between 2017 and 2020 — confirmed by Uber's own spokesperson.[3]

38.    Uber has also availed itself to litigation relating to carjackings. In December 2020, an Uber driver named Cherno Ceesay as murdered by Uber riders in Issaquah, Washington. Two individuals created fake Uber rider accounts under the name "Stephanie Tylor" and used a prepaid gift card as anonymous payment — just 13 minutes before requesting a ride — and then fatally stabbed Mr. Ceesay in a botched carjacking attempt. Uber was a named defendant in the ensuing wrongful death litigation, *Drammeh et al. v. Uber Technologies, Inc. and Rasier, LLC,* Case No. 2:21-cv-00202 (W.D. Wash.). The Ninth Circuit certified to the Washington Supreme Court the question of whether Uber has a special relationship with its drivers giving rise to a duty of reasonable care in matching drivers with riders, and whether the carjacking and murder of a rideshare driver by a rider is legally foreseeable. *Drammeh v. Uber Techs*., Inc., No. 22-36038 (9th Cir. June 24, 2024). Ultimately, the Ninth Circuit held

39.    Additionally, Uber has actual awareness of other murders in the rideshare industry including the murder of Lyft driver Elijah Newman. Elijah Newmanan immigrant from Ghana, was murdered in St. Louis, Missouri on April 15, 2021, when a rider who had booked a Lyft ride under a false name shot Mr. Newman during an attempted carjacking. Importantly, the suspect who later murdered Mr. Newman was linked by investigators to a series of earlier ride-share carjackings on the Uber application through a fraudulent email address used by the carjacker to create rider accounts on the Uber platform. The same Lyft Rider who murdered Elijah Newman carjacked multiple **Uber Driver** at the exact same location approximately one month prior to Mr. Newman's murder.

40.    Lyft's own 2024 Safety Transparency Report confirmed: "mirroring trends in cities across the U.S., we saw a significant increase in carjackings on the Lyft platform — peaking in late 2020." Lyft also acknowledged it had implemented additional rider identity verification for anonymous payment methods specifically "after a nationwide rise in carjackings in late 2020" in order "to help protect the driver community."

41.    Lyft and Uber are active safety data-sharing partners through the Industry Sharing Safety Program — a joint program Lyft and Uber launched to share information about dangerous conditions on their platform in order to reciprocally remove dangerous users. Uber cannot credibly claim ignorance of industry-wide carjacking trends when it shared safety data with Lyft through a formal institutional program.

42.    Prior to the Plaintiff's brutal attack both Uber and Lyft expended considerable resources to analyze rideshare carjackings and were actually aware of this problem on their respective systems. Despite this, Uber never informed the Plaintiff of the risk of carjackings, murders, or extreme violence on the Uber Platform.

43.    Uber's own 2021–2022 Safety Report explicitly acknowledged the carjacking surge and stated it was "reflected in trends around the country" and "reflected on our platform," citing an 8.1% national FBI increase in carjackings from 2021 to 2022, a 92% increase in Chicago, and a 78% increase in Washington, D.C. — and simultaneously reported that motor vehicle theft

---

[3] Kerr, Uber And Lyft Drivers Are Being Carjacked at Alarming Rates, *The Markup*, 22 July 2021, https://themarkup.org/working-for-an-algorithm/2021/07/22/uber-and-lyft-drivers-are-being-carjacked-at-alarming-rates

"doubled in both 2021 and 2022 compared with pre-pandemic 2019." Police departments in Minneapolis, Chicago, Oakland, and St. Louis publicly identified Uber and Lyft drivers as targets of coordinated carjacking schemes; Minneapolis issued a public warning after nearly 50 carjackings of rideshare drivers in a two-month period alone.

44.     The arbitration provision within Driver Agreement was buried in boilerplate, reachable only by navigating to a "Legal" submenu among over forty separate contractual options hidden in the app's menu sidebar. Uber additionally retained the unilateral right to modify the Driver Agreement at any time without meaningful notice to drivers. This contractual framework was designed to minimize Uber's liability while extracting maximum commercial benefit from its drivers' labor and physical safety risk.

## D. Plaintiff Omar Torres Sulbaran and His Relationship with Uber

45.     In order to access the Uber Platform, Mr. Torres was required to accept the Driver Platform Agreement — a standardized, non-negotiable adhesion contract presented by Uber on a take-it-or-leave-it basis. Mr. Torres had no ability to negotiate the agreement's terms. Pursuant to the Agreement and Uber's operating procedures, Mr. Torres received ride assignments exclusively from Uber through the Uber Driver App and was provided only the information Uber chose to disclose — the rider's account name and pickup location. Mr. Torres relied on Uber's exclusive control of rider vetting, its representations regarding platform safety, and its role as the matching principal to make each ride safe.

46.     Mr. Torres regularly drove as an Uber Driver to earn money to survive. On May 6, 2024, the Plaintiff logged-in to the Uber Driver App at approximately 5:30 p.m. and began accepting ride requests from Uber. The Plaintiff performed three  before accepting the trip that resulted in his heinous attack.

## E. The Third-Party Account — William Wideman and Antonio Rodgers

47.     The events of May 6, 2024 began not with Antonio Rodgers — the man who would attack Mr. Torres — but with William B. Wideman. Mr. Wideman was an Uber accountholder who was a stranger to Antonio Rodgers. On May 6, 2024, Mr. Wideman made a stop at the Amoco gas station located at 3401 Milwaukee Street, Madison, Wisconsin at approximately 8:20 p.m. Surveillance video from the gas station captured Mr. Wideman at this location when Antonio Rodgers entered the convenience store at approximately 8:21 p.m.. Mr. Rodgers appeared  to hold an object consistent with the knife later recovered from the scene that was used in the Plaintiff's attack, and interacting with the store clerk and then Wideman.

48.     Critically, the Uber ride that brought Antonio Rodgers into contact with Plaintiff Torres was not requested through Rodgers's own Uber account. It was requested by William Wideman, using Wideman's own Uber account and phone. As confirmed by Uber's own exigent records disclosed to the Madison Police Department, the account holder listed on the trip record for Mr. Torres's last ride was William Wideman — not Antonio Rodgers. Wideman requested the ride at approximately 8:24 p.m. for a pickup near the corner of Milwaukee Street and South Fair Oaks Avenue. The ride was accepted by Mr. Torres at approximately 8:32 p.m. Uber's Platform had no

9

mechanism to flag, verify, or alert Mr. Torres that the person entering his vehicle was not the account holder who had booked the ride.

49.    The pattern in this case — a ride booked by one person on behalf of a complete stranger, with no verification that the person entering the vehicle was the account holder — mirrors the fraudulent account pattern Uber had already identified as a safety risk in the *Drammeh* litigation and in its own internal research. Despite this known risk, Uber had no real-time verification protocol to alert Mr. Torres that the individual entering his vehicle was unknown to the account holder who booked the ride. Additionally, Uber never warned Mr. Torres that transporting non-accountholders exposed the Plaintiff to a known increased risk of injury, including murder and rape.

50.    Wideman informed investigators that he had never seen Rodgers before in his life, that he had a "weird feeling" about him, and that he noticed the convenience store clerk also seemed uncomfortable in Rodgers's presence. Wideman reported to the police that Rodgers initially asked Wideman to give him a ride to the local Target store, but Wideman did not feel safe to transport Rodgers, a complete stranger, in his vehicle to Target.

51.    Due to Wideman not feeling safe to give Rodgers a ride to Target, Wideman arranged the Uber ride to help Rodgers get to the local Target store. Wideman was interviewed after the near-murder of the Plaintiff by the Police and claimed he was devastated to learn that the driver had been attacked by Rodgers. The investigation of the attack against the Plaintiff indicated that Rodgers was a complete stranger to Wideman and that Wideman did not have any knowledge that Rodgers planned to carjack or attempt to murder the Plaintiff.

Uber's system is designed to know where the accountholder who ordered the trip is in relation to the Uber Driver. Indeed, Uber's system continuously uses GPS location to track both the Rider and the Driver during the trip and was triggered when the Plaintiff left the Amoco gas station without Wideman in the vehicle.

## F. Bounce Trips on the Uber System

52.    Uber's advanced system tracks interpersonal conflicts between non-accountholders who take trips and Uber Drivers. When a non-accountholder takes a trip with an Uber Driver, Uber calls these trips "**Bounce Trips**." For at least a decade, Uber has maintained knowledge that **Bounce Trips** expose an Uber Driver to an increased risk of injury and physical altercation due to the anonymity of the non-accountholder in the vehicle. Uber has studied ways to minimize risk to the Uber Driver when a Bounce Trip occurs, however Uber has never informed drivers that Bounce Trips are dangerous.

53.    Uber has continually put profits over safety related to Bounce Trips because Uber has identified that Bounce Trips are a key profit driver. Bounce Trips allow Uber to make money on a segment of the population that may not have a smart-phone or may not have an Uber Account. By allowing accountholders to order trips for any individual (even a complete stranger), Uber chooses to ignore the known risks of Bounce Trips to Uber Drivers in exchange for millions of dollars made on trips between Uber Drivers and non-account Riders.

54.    Uber never informed the Plaintiff—or any other Uber Driver—that Bounce Trips are significantly more dangerous than trips between an Uber Driver and an Uber Rider Accountholder.

10

Uber does not want Uber Drivers to cancel trips due to the knowledge that the rider is a non-accountholder because Uber desires to earn money on as many trips as possible on a daily basis.

55.     Uber also deploys performance metrics that require the Driver to accept trips, even Bounce Trips when the Uber Driver does not have any information about his perspective rider. Uber deploys a Driver performance based program known as Uber Pro that requires the Driver to maintain a certain trip acceptance percentage and a certain trip cancelation percentage. In exchange for adhering to Uber's performance thresholds on trip acceptance and trip cancellation, Uber provides its Drivers with additional information when the trip is offered, such as general direction that the trip will go (e.g. 5 Miles to the Northeast) and the portion of the fare that the Driver is expected to receive, if the trip is accepted. If Drivers do not adhere to Uber's thresholds of accepting a certain percentage of trips and not cancelling a certain percentage of trips, Uber withholds information about the general direction and distance of a trip when it offers the trip to the Uber Driver.

### G. The May 6, 2024 Attack on Omar Torres Sulbaran

56.     When Mr. Torres arrived at the pickup location — the Amoco gas station at Milwaukee Street and South Fair Oaks Avenue — he observed Wideman at the gas station. Wideman pointed toward Antonio Rodgers standing in the parking lot, indicating that Rodgers was the person to be picked up instead. Wideman then departed. Rodgers entered Mr. Torres's vehicle and sat in the rear passenger seat, carrying a black backpack on his lap. Mr. Torres drove Rodgers toward the Target store at 4301 Lien Road as directed by the Uber app.

57.     As Mr. Torres arrived at Target, Rodgers directed him not to stop at the front entrance but to pull further into the parking lot, claiming he was an employee who wanted to be dropped at the employee door. At approximately 8:40–8:41 p.m., as Mr. Torres continued past the main entrance, Rodgers pulled a knife on Mr. Torres that was concealed in his hoodie pocket and demanded Mr. Torres's phone, wallet, and keys. When Mr. Torres refused, Rodgers stabbed him in the neck, shoulder, and stomach/ribcage area multiple times without warning. These wounds inflicted were life-threatening.

58.     Bleeding profusely, Mr. Torres undid his seatbelt and exited the still-moving vehicle. Mr. Torres stumbled to the main Target entrance, collapsed, and told a bystander: "Call my wife, I'm going to die." A nursing student Target employee rendered aid by applying pressure to the Plaintiff's wounds and 911 was called by multiple Target bystanders.

59.     After Mr. Torres exited the vehicle, Rodgers climbed into the driver's seat and fled eastbound on Lien Road in Mr. Torres's Toyota Highlander. Rodgers used Mr. Torres's unlocked iPhone — which displayed a family photograph as the lock screen — to navigate to Milwaukee, Wisconsin, first switching the phone from Spanish to English. Rodgers used Mr. Torres's wife's credit card to purchase gas in Oconomowoc, Wisconsin during his flight.

60.     Mr. Torres was transported by ambulance to UW Hospital's trauma center. Emergency staff confirmed five stab wounds. The attending physician noted that one wound may have penetrated Mr. Torres's abdominal cavity and that the shoulder wound was of particular concern. Mr. Torres underwent emergency exploratory surgery.

61.    Racine County Sheriff's deputies located the stolen Highlander on northbound Interstate 94. When commanded to stop, Rodgers fled at speeds exceeding 120 miles per hour. Law enforcement deployed tire deflation devices and executed a PIT maneuver on Rodgers, stopping the vehicle. Rodgers was taken into custody.

62.    When Madison Police detectives interviewed Rodgers in the early morning hours of May 7, 2024, he admitted to the stabbing and stated his plan to steal a car had formed while he was at the gas station. When asked why he stabbed the driver, Rodgers stated: "I don't know, making poor decisions." Rodgers stated that he felt bad because he had seen a photograph of Mr. Torres's family on the dashboard and on his phone.

63.    DNA analysis by the Wisconsin State Crime Laboratory confirmed that knife blade swabs contained a single-source male DNA profile consistent with Mr. Torres's DNA, and knife handle swabs contained DNA of both Mr. Torres and Rodgers. Antonio Rodgers subsequently entered a guilty plea and was sent to prison.

## H. Antonio Rodgers Was Known To Uber as a Risk

64.    On information and belief, even though Antonio Rodgers did not order the Uber trip in which he brutally stabbed the Plaintiff multiple times, Antonio Rodgers had previously entered an agreement with Uber and was at the time (or had been) an Uber Accountholder.

65.    On information and belief, Uber was on actual notice that Antonio Rodgers was a danger to Uber Drivers due to prior reports of safety incidents and violations of Uber's standard operation procedures committed by Antonio Rodgers.

66.    On information and belief, Uber had previously suspended, waitlisted, or deactivated Antonio Rodgers' Uber account due to prior safety violations committed by Antonio Rodgers.

67.    On information and belief, Uber maintained safety data that was automatically collected on Antonio Rodgers through its automatic telematic data systems and flagged Antonio Rodger's rider account for safety violations.

68.    On information and belief, Uber maintains safety related infractions related to Antonio Rodgers on its platform known as Safety Lens and uses the safety related data from Safety Lens concerning Antonio Rodgers to assess the risk to the driver on trips that Antonio Rodgers takes.

69.    Uber maintains actual knowledge that Bounce Trips allow previously deactivated or suspended Uber Riders to use the Uber System, even though Uber has made a determination that the individual is a safety risk and the individual has been removed from the Uber System due to safety incidents.

70.    Uber never informed the Plaintiff that Bounce Trips substantially increase the risk of injuries to the Driver because Bounce Trips allow the Uber Driver to be paired by Uber with a

12

previously deactivated or suspended Uber Rider with a history of safety violations on the Uber Platform.

## I. Uber's Failure to Warn and Failure to Protect Mr. Torres

71.    The attack on Mr. Torres was directly enabled by Uber's exclusive control over the rider matching process and its failure to implement reasonable safety measures. The Uber Platform had no mechanism to alert Mr. Torres that: (a) the individual entering his vehicle was not the account holder who booked the ride; (b) the ride had been booked by one person on behalf of a complete stranger; (c) the stranger entering his vehicle was unknown to the account holder; or (d) there were risk indicators associated with the circumstances of the ride request.

72.    Uber possessed the technical capability to alert Mr. Torres of these facts and chose not to act. Uber knew the account holder was William Wideman; could have verified whether Wideman himself entered the vehicle; and had the technical infrastructure — including GPS tracking, real-time monitoring, and its app interface — to facilitate such verification. Uber had already developed and deployed PIN verification, verified rider badge technology, and photo verification in other contexts. None of these protections were available to Mr. Torres in Madison on May 6, 2024.

## J. Plaintiff's Damages

73.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff Omar Torres Sulbaran has suffered severe, permanent, and continuing injuries and damages, including but not limited to:

a.  At least five stab wounds constituting life-threatening injuries confirmed by emergency medical personnel and trauma physicians at UW Hospital;

b.  Emergency exploratory surgery at UW Hospital's trauma center on the night of May 6–7, 2024, to address stab wounds including a wound believed to have potentially penetrated his abdominal cavity;

c.  Hospitalization and extensive medical treatment following surgery;

d.  Ongoing physical therapy and medical treatment, the full extent and cost of which remain to be determined;

e.  Permanent physical scarring and disfigurement from his stab wounds;

f.  Lost wages and diminished earning capacity, including wages lost during his recovery and any permanent impairment of his ability to work;

g.  Severe emotional distress, trauma, and post-traumatic stress disorder. Mr. Torres expressed to witnesses at the scene that he thought he was dying, later became emotional when reflecting on the incident, and stated he did not feel safe and did not understand why this was done to him;

h.  Loss of and damage to his personal vehicle — a silver 2021 Toyota Highlander — stolen by his attacker, driven at 120+ mph during a high-speed police pursuit, subjected to tire deflation and a PIT maneuver, and returned to Mr. Torres damaged with missing tires and

13

dents; Rodgers also used Mr. Torres's wife's credit card to purchase gas during the flight; and

i. Pain and suffering, loss of enjoyment of life, and other general and special damages in amounts to be proven at trial.

74.    Plaintiff's medical treatment is ongoing. The full extent of his damages — including future medical expenses, future lost wages, and future non-economic damages — have not yet been fully ascertained. Plaintiff reserves the right to supplement his damages claims as additional information becomes available through discovery and ongoing medical evaluation.

## K. Uber's Predictive Software for Interpersonal Conflicts, including Violence Against Drivers

75.    Uber deploys predictive software that applies a risk score to the trips that it pairs strangers together on. Uber had actual knowledge that the trip that resulted in the near-fatal attack on the Plaintiff maintained a high risk of injury to the Plaintiff due to the anonymity of the Rider, the location of the pickup / drop-off, the hour of the day the trip occurred, and many other internal data points used to develop the risk score of this trip.

76.    Despite knowing that the trip in question was high-risk of injury to the Plaintiff, Uber made the choice to pair the Plaintiff with the Rider on this Trip.  Uber's data indicated that there was a high-risk of injury to the Plaintiff on this trip and Uber was correct. Uber's pairing of the Plaintiff with the rider in question resulted in the Plaintiff almost being brutally murdered by being stabbed multiple times by the Rider.

## IV. CAUSES OF ACTION

Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

## FIRST CAUSE OF ACTION - Negligence — Special Relationship Duty to Protect Driver Against All Defendants

77.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

78.    At all times relevant, Defendants owed Plaintiff a duty of reasonable care arising from the special relationship between Uber and its drivers. That relationship is characterized by control, dependence, vulnerability, and entrustment recognized as sufficient to give rise to an affirmative duty to protect.

79.    The special relationship between Uber and Mr. Torres arose from: (a) Uber's exclusive control over the process by which Mr. Torres was matched with riders, with no independent ability to verify the identity, background, criminal history, or payment method of assigned riders; (b) Mr. Torres's entrustment of his physical safety to Uber's matching decisions; (c) Uber's requirement that Mr. Torres accept ride requests under threat of financial penalty, deactivation, and loss of priority access — removing his ordinary tools of self-protection; (d) Uber's possession of superior

14

information about riders that it withheld from drivers; and (e) Mr. Torres's reasonable reliance on Uber's representations about rider vetting and platform safety.

80.    The gravity of Uber's breach is underscored by the documented occupational danger it knowingly placed Mr. Torres in without adequate protection. A 2010 OSHA publication established that taxi and for-hire drivers are over 20 times more likely to be murdered on the job than other workers.[4] Uber knew of this risk from its own internal investigation completed in 2019. For decades OSHA has recommended physical partitions as protective measures for for-hire drivers. Uber controlled vehicle inspection standards but never required these safeguards. The Plaintiff did not have a partition in his vehicle.

81.    Uber never warned Mr. Torres of the occupational homicide risk or trained him to identify dangerous passengers.

82.    Uber compounded this breach through a system of perverse financial incentives that stripped Mr. Torres of any practical ability to exercise independent safety judgment: (a) drivers who declined rides were demoted in Uber's queue and risked suspension or deactivation; (b) acceptance-rate bonuses were the difference between profitability and loss; (c) before drivers must accept or decline, Uber provided only a first name and pickup location — no photo, no account history, no payment method, no risk flags; (d) the incentive program known as Uber Pro required Uber Drivers to accept trips, not cancel trips, and maintain a high rating in order for Uber to provide additional pre-trip information to the Driver before accepting any trip. This combination of information deprivation and financial coercion removed Mr. Torres's ability to protect himself.

83.    Uber breached its duty of reasonable care by: (a) failing to implement rider identity verification for rides booked by third-party account holders on behalf of unverified strangers; (b) failing to flag or disclose the identity mismatch between account holder Wideman and actual rider Rodgers; (c) failing to implement real-time verification — PIN confirmation, photo match, or boarding confirmation — even though such technology was available and had been deployed in other contexts; (d) failing to deploy the verified rider badge in Madison, Wisconsin; (e) failing to warn Mr. Torres that Uber does not screen riders or verify persons who actually board drivers' vehicles; (f) failing to use its data triangulation capabilities to identify elevated risk indicators in the May 6, 2024 ride;(g) maintaining a coercive acceptance-penalty system that prevented Mr. Torres from exercising independent safety judgment; and (h) failing to inform the Plaintiff of the increased risk of harm associated with "Bounce Trip" rides.

84.    Uber's breaches reflect a corporate policy — documented across three successive Safety Reports — of prioritizing platform growth and trip volume over driver safety.  Uber's conduct evidences a conscious attitude and corporate policy of 'profits over people' characterized by a willful and knowing disregard for the rights and safety of others.

85.    As a direct and proximate result of Uber's negligence, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

---

[4] OSHA, Fact Sheet: Workplace Violence (2010); Chaumont Menendez et al., 56(8) J. Occup. Environ. Med. 768 (2017).

**SECOND CAUSE OF ACTION Negligence — Misfeasance / Affirmative Conduct Creating Risk of Harm Against All Defendants**

86.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

87.    Independent of and in addition to any special relationship duty, Defendants owed Mr. Torres a duty of ordinary reasonable care because Uber's own affirmative conduct in designing, operating, marketing, and controlling its Platform created or substantially contributed to the risk of harm that materialized in the attack. The risk at issue here would simply not have existed without Uber's own conduct."); Restatement (Second) of Torts § 302B.

88.    The risk that materialized — a carjacking and stabbing by an unverified stranger who boarded Mr. Torres's vehicle through Uber's third-party-booked ride system — would not have existed but for Uber's affirmative conduct, including: (a) creating and operating an app-based platform that placed an unverified, anonymous stranger in the rear seat of Mr. Torres's personal vehicle; (b) marketing the Platform as a safe and vetted environment while disclaiming rider screening in fine print; (c) exclusively controlling all rider account creation, identity verification, payment processing, and driver-to-rider matching; (d) designing the Platform to permit any user to book a ride on behalf of a complete stranger, without any mechanism to verify or disclose the identity of the person who would actually board the vehicle; and (e) penalizing drivers who refuse rides, preventing them from exercising independent safety judgment.

89.    Uber breached its duty of ordinary reasonable care through the specific acts and omissions alleged in the First Cause of Action, incorporated herein by reference.

90.    As a direct and proximate result of Uber's breach, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

**THIRD CAUSE OF ACTION - Negligent Matching / Negligent Facilitation Against All Defendants**

91.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

92.    Uber retained exclusive control over the process of matching drivers with riders. This exclusive control created an affirmative duty to exercise reasonable care in executing that matching function. Uber's duty in the matching process included: (a) screening newly created accounts for fraud indicators before matching; (b) flagging rider accounts using anonymous information such as fake names, fake emails, or anonymous payment methods ; (c) identifying and flagging rides where the account holder is at a different location from the designated boarding person; (d) imposing additional verification before matching when objective risk indicators are present; and (e) applying its data collection and analysis capabilities to identify suspicious account activity.

93.    Uber breached its matching duty. The May 6, 2024 ride presented multiple objective risk indicators Uber should have flagged: (a) the ride was booked for a person other than the account holder; (c) the pickup was at a gas station convenience store in the evening hours — a location-type and time associated with elevated assault risk based on Uber's own data; and (d) no verification was applied to the identity of the actual person who would board the vehicle.

16

94. Uber possesses the technological capability to have detected and flagged these indicators and chose not to deploy it. Uber collects account creation date, payment method type, device event data, and location history for every rider account, aggregated across ten billion trips through its "Uber Movement" platform

95. Uber's negligent matching reflects a deliberate double standard. To drive for Uber, applicants must submit to full criminal background checks, motor vehicle record reviews, annual re-screening, and continuous monitoring — a process rigorous enough that more than 750,000 prospective drivers were disqualified in 2021–2022 alone, and more than 185,000 active drivers were removed through continuous monitoring To become an Uber rider, a person need only supply a phone number, email address, and payment method — completable in minutes with fabricated information. No background check. No identity verification. No screening of any kind.

96. Uber also maintains vast data indicating that anonymous riders and Bounce Trips create a danger to the Uber Drivers, however Uber never informed the Plaintiff of these dangers.

97. As a direct and proximate result of Uber's negligent matching, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION - Negligent Failure to Warn Against All Defendants

98. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

99. Uber had a duty to warn Mr. Torres of known and foreseeable dangers associated with accepting rides booked under third-party accounts, rides booked on behalf of unverified strangers, and the systematic vulnerability created by Uber's failure to screen or identify the persons who actually board drivers' vehicles.

100. Uber possessed, and exclusively possessed, material safety information it withheld from Mr. Torres: (a) that the May 6, 2024 ride had been booked by William Wideman, not by the person who entered his vehicle; (b) that Antonio Rodgers was a complete stranger to the account holder; (c) that Uber's Platform did not verify whether the person boarding was the account holder; and (d) that drivers faced a documented, rising, and specifically foreseeable risk of violent carjacking assault that Uber had acknowledged in its own Safety Reports. Uber also had a duty to warn Plaintiff Torres of the material disclaimer in the Driver agreement that "WE DO NOT SCREEN OR EVALUATE THESE RIDERS" — buried in fine print while Uber simultaneously marketed platform safety.

101. Uber breached its duty to warn by: (a) failing to disclose the identity mismatch between account holder Wideman and rider Rodgers; (b) failing to alert Mr. Torres that Uber does not verify the identity of persons who actually board drivers' vehicles; (c) failing to implement any in-app notification for rides booked by one account holder on behalf of an unknown third party; (d) making affirmative safety representations while concealing the escalating carjacking risk documented in its own Safety Reports; and (e) failing to warn that the verified rider badge and PIN verification had not been deployed in Madison, WI.

102. Additionally, Uber had actual awareness and data prior to the trip occurring that the Uber's choice to pair the Plaintiff with the Rider offered a high risk of injury to the Plaintiff. Despite this,

17

Uber did not warn the Plaintiff that that the trip in which the Plaintiff was being paired was high risk.

103.    Uber never informed the Plaintiff that Drivers were being assaulted and murdered at increasingly high rates on its system year over year.

104.    Had Uber warned Mr. Torres of the identity mismatch, the third-party booking, the documented carjacking risk, or that the trip in question held a high risk of injury to Plaintiff Torres, the Plaintiff would have had the opportunity to take protective measures or decline the ride.

105.    As a direct and proximate result of Uber's negligent failure to warn, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

**FIFTH CAUSE OF ACTION - Apparent Agency / Ostensible Agency Against All Defendants**

106.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

107.    A principal may be held liable for the acts of an apparent or ostensible agent where: (1) the principal performed acts or made representations that would lead a reasonable person to believe that agency existed; (2) the plaintiff had knowledge of and relied upon those acts or representations; and (3) the plaintiff's reliance was reasonable and consistent with ordinary care and prudence.

108.    At all times relevant, Uber held itself out to drivers — including Mr. Torres — as the principal in the transportation relationship, exercising comprehensive authority over the matching of drivers with riders, the identity of persons authorized to use the Platform, they setting of fares, the payment of fares, the handling of customer support, the prevention of the Driver from creating his own book of business on the Uber Platform, the payments of incentives, the withholding of certain critical information such as identifying information about the rider, trip direction, trip distance, and the safety standards applicable to all parties. Uber required Mr. Torres to operate under its Platform rules as a condition of platform access, presented itself as the authoritative source of rider safety certification, and held itself out as the entity that controlled which riders would be matched with which drivers.

109.    Mr. Torres reasonably believed and relied upon the fact that the rider assigned to him by Uber's algorithm had been vetted, identified, and matched through a process Uber controlled and was responsible for. He accepted the May 6, 2024 ride in direct reliance on Uber's role as the matching principal — trusting that Uber had performed, or was responsible for, the identity verification functions it held itself out as performing. Uber's public representations affirmatively cultivated the appearance that riders had been verified, while its private contractual disclaimers purported to disclaim that responsibility.

110.    The attack occurred within the scope of the apparent agency relationship — during an Uber-matched ride, in an Uber-identified vehicle, with a person Uber assigned to Mr. Torres's vehicle as an authorized rider. The harm was a direct consequence of Uber's failure to fulfill the safety obligations it held itself out as performing.

18

111.    As a direct and proximate result of Uber's creation of the apparent agency relationship and Mr. Torres's reasonable reliance thereon, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION - Negligent Design of the Uber Platform Against All Defendants

112.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

113.    At all times relevant, Defendants designed, marketed, distributed, and provided access to a digital platform product — the Uber rideshare Platform, including the Uber Driver App — in the course of their regular business. The Platform as designed was defective and unreasonably dangerous because it lacked adequate safety features to prevent the foreseeable harm of drivers being assaulted by unverified, anonymous, or third-party-account riders. Specifically, the Platform was defectively designed in that it: (a) contained no mechanism to verify that the person entering a driver's vehicle was the account holder who booked the ride; (b) permitted account holders to book rides for unverified strangers with no disclosure to the driver; (c) provided no real-time alert or risk indicator for third-party bookings, newly created accounts, or account-holder location mismatches; (d) provided no feasible way for the Plaintiff to notify Uber or Authorities of an attack while on trip; and (e) penalized drivers for exercising independent safety judgment by declining or canceling rides, removing the human safety check that could have protected them.

114.    Reasonable alternative designs existed at the time of the attack, including: PIN verification at boarding that would precent anonymous riders; photo verification matching the boarding passenger against the account holder's profile; real-time risk-flag notifications for Bounce Trip / third-party-booked rides; and the verified rider badge system Uber had already developed and deployed in select cities—but not Madison, WI. Uber's own Safety Reports confirm it was aware of and had adopted each of these design alternatives in some contexts in cities of its choosing across the world.

115.    The defective design was a proximate cause of Mr. Torres's injuries. A non-defectively designed Platform would have either prevented Rodgers from boarding without verification or alerted Mr. Torres to the identity mismatch before the attack.

116.    As a direct and proximate result of the defective design of the Uber Platform, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

## SEVENTH CAUSE OF ACTION - Negligent Misrepresentation Against All Defendants

117.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

118.    Uber, in the course of its business and in its relationship with Mr. Torres, supplied false and misleading information regarding the safety of its Platform and the protections afforded to drivers who accept ride requests through the Uber app. Uber negligently misrepresented: (a) that Uber vets, screens, or evaluates the riders assigned to drivers, when its own Agreement admits "WE DO NOT SCREEN OR EVALUATE THESE RIDERS"; (b) that drivers can rely on the Platform's matching process as a safe, verified system for connecting drivers with legitimate,

identifiable riders; (c) that its anonymous payment verification measures — which Uber's own 2019–2020 Safety Report described as a "deterrent to those who are trying to use the app for theft or to harm drivers" — would protect drivers from the specific risk present here;  (d) that Uber's safety programs meaningfully reduced drivers' risk of violent assault; and, (e) Uber's safety toolkit would protect the Plaintiff from harm and made the Uber Trips the Plaintiff performed safe.

119.    Uber failed to exercise reasonable care in making these representations, knowing that: its Platform did not verify persons who actually boarded drivers' vehicles; its anonymous payment verification did not apply to strangers boarding under another user's verified account; the verified rider badge had not been deployed in Madison; its own Safety Reports documented a 96% increase in driver fatalities from physical assault, with nearly one-third involving motor vehicle theft; and, the Safety Toolkit only provides a "perception of safety" not actual safety for the Uber Driver.

120.    Mr. Torres justifiably relied on Uber's representations about platform safety in deciding to accept rides through the Platform, including the May 6, 2024 ride. Had Uber accurately disclosed the true state of its rider screening practices and the documented escalation of driver assault and carjacking risk on its Platform, Mr. Torres would have been in a materially different position with respect to his own safety decisions.

121.    As a direct and proximate result of Uber's negligent misrepresentations, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

## EIGHTH CAUSE OF ACTION - Negligent Infliction of Emotional Distress Against All Defendants

122.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

123.    As set forth herein, Uber owed Mr. Torres duties of care arising from the special relationship between Uber and its drivers and  its misfeasance in creating unreasonable risks of harm. Uber breached each of these duties.

124.    As a direct and proximate result of Uber's negligence, Mr. Torres was stabbed five times in his own vehicle by a stranger Uber had assigned to his car without any identity verification. The attack was sudden and without warning. Mr. Torres, bleeding from five stab wounds, exited his still-moving vehicle in the Target parking lot, collapsed near the store entrance, and told bystanders he believed he was dying. He underwent emergency surgery at UW Hospital's trauma center. He suffered and continues to suffer severe emotional distress, post-traumatic stress disorder, anxiety, and psychological harm.

125.    As a direct and proximate result of Uber's negligent conduct, Plaintiff has sustained and will sustain past and future emotional distress, psychological injury, and mental anguish, in amounts to be proven at trial.

## NINTH CAUSE OF ACTION - Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants

126.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

20

127. At all relevant times, the Plaintiff was engaged in a contract with the Defendants in interstate commerce of the business of transporting passengers for hire across geographic areas, including routes that crossed state lines or formed part of the broader interstate transportation network. The Plaintiff's work was not incidental to commerce — it was the movement of persons from one place to another. The Plaintiff acted as an Uber Driver who played a direct and necessary role in the free flow of goods and people across interstate channels of commerce on behalf of Uber.

128. The Agreement between the Plaintiff and Defendants constitutes an enforceable contract. The Agreement imposed obligations on Uber including to operate the Platform in a manner consistent with its published safety representations, to provide the safety infrastructure and rider management that Uber held itself out as performing, and to deal with Mr. Torres honestly and in good faith.

129. The Agreement between the Plaintiff and the Defendants is a standardized, non-negotiable contract of adhesion, presented by Uber on a take-it-or-leave-it basis as an absolute condition of platform access. The Plaintiff had no ability to negotiate, modify, or opt out of any term — including the arbitration clause — and had no meaningful alternative to accepting Uber's terms if he wished to access the Uber Platform as a for-hire driver in his market. The gross disparity in bargaining power between the Plaintiff — an individual gig-economy worker — and Uber Technologies, Inc. — a global technology company with a market capitalization in the tens of billions of dollars — is patent and undeniable.

130. The Agreement, and all clauses there in, was not presented to the Plaintiff in a manner calculated to ensure his informed and voluntary assent to the specific waiver of any rights, including the Plaintiff's right to a jury trial. Rather, the Agreement is a multi-page document that Uber's own app interface did not require drivers to open or read; drivers were presented only with a button labeled "YES, I AGREE" and could not access the Driver App without clicking it. The clauses within the agreement, including the arbitration provisions, were accessible only by navigating multiple layers of the app interface – while Uber retained the unilateral right to modify all terms at any time. The Plaintiff had no meaningful opportunity to review or negotiate the Agreement and Uber retained unilateral modification power of the Agreement. These elements constitute substantial unconscionability and a contract of adhesion.

131. Uber breached the express and implied terms of the Agreement by: (a) including a fine-print disclaimer that Uber does not screen riders while simultaneously representing through marketing and Safety Reports that rider safety measures were in place; (b) deploying verified rider badge and PIN verification technology in other markets while withholding those features from Madison without disclosure; (c) maintaining a cancellation penalty system that coerced drivers into accepting rides they might otherwise decline, in circumstances where Uber's safety representations implied drivers could rely on Uber's matching to ensure safe assignments; and (d) matching Mr. Torres with an unverified, undisclosed stranger while representing to drivers that the Platform's safety infrastructure protected them from precisely this risk — a breach of the implied covenant of good faith and fair dealing.

132. As a direct and proximate result of Defendants' breach, Plaintiff has sustained the damages described herein, in amounts to be proven at trial.

**TENTH CAUSE OF ACTION - Punitive Damages — Wis. Stat. § 895.043 Against All Defendants**

133.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

134.    In addition to ordinary negligence, Defendants acted with gross negligence and in intentional disregard for the rights of Plaintiff Torres, entitling Plaintiff to punitive damages under Wis. Stat. § 895.043. Under Wisconsin law, punitive damages are available where a defendant deliberately proceeded in the face of actual knowledge that its conduct created an unreasonable and substantial risk of harm to others.

135.    Uber acted with intentional disregard for the rights and safety of Plaintiff Torres based on the following facts, among others: (a) Uber's three successive U.S. Safety Reports — published in 2019, 2022, and 2024 — disclosed a 96% increase in fatal physical assault incidents from 2019–2020 to 2021–2022, with driver fatalities overtaking rider fatalities for the first time and nearly one-third involving motor vehicle theft; (b) Uber's own 2021–2022 Safety Report explicitly acknowledged that the national carjacking surge was "reflected on our platform," yet Uber failed to deploy the verified rider badge in Madison; (c) Uber's own 2019–2020 Safety Report acknowledged that anonymous payment verification was designed as a "deterrent to those who are trying to use the app to harm drivers," yet Uber had no equivalent protection for rides booked by a third party on behalf of an unverified stranger; (d) Uber collected 24,000 internal safety incident reports of physical assaults against its drivers between 2017 and 2020 — a figure confirmed by Uber's own spokesperson — while continuing to match drivers with unscreened, unverified riders; (e) Uber possessed the data triangulation capabilities to flag the risk indicators present in the May 6, 2024 ride and elected to deploy those capabilities against competitors and regulators instead; and (f) Uber maintained a coercive acceptance-penalty system that prevented drivers from exercising independent safety judgment, while simultaneously failing to screen the riders it forced drivers to accept.

136.    Uber's conduct reflects a sustained pattern of prioritizing revenue growth and platform expansion over driver safety, in deliberate disregard of mounting evidence of a known, escalating, and preventable threat to its drivers. Uber's behavior evinces a conscious attitude and corporate policy of 'profits over people' characterized by a willful and knowing disregard for the rights and safety of others so base and contemptible as to be looked down on and despised by reasonable people.

137.    As a direct and proximate result of Uber's intentional disregard for the rights and safety of Plaintiff Torres, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from engaging in similar conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Omar Torres Sulbaran respectfully requests that this Court enter judgment in his favor and against Defendants Uber Technologies, Inc. and Rasier, LLC, jointly and severally, and award the following relief:

A. Compensatory damages for past and future physical pain and suffering, permanent scarring and physical injury, lost wages and loss of earning capacity, past and future medical expenses, emotional distress and post-traumatic stress disorder, and loss of enjoyment of life, in amounts to be determined at trial;

B. Compensation for loss of and damage to Plaintiff's 2021 Toyota Highlander and all other property damages arising from the attack;

C. Punitive and exemplary damages in an amount sufficient to punish Defendants for their conscious, willful, and repeated disregard for driver safety — including Uber's collection of 24,000 driver assault reports, publication of three successive Safety Reports acknowledging escalating driver fatalities and carjacking on its own Platform, and simultaneous failure to deploy available safety measures in Madison, Wisconsin — and to deter Defendants and others from engaging in similar conduct in the future;

D. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

E. Costs of suit and attorneys' fees to the fullest extent permitted by law; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Omar Torres Sulbaran hereby demands a trial by jury on all issues so triable.

Dated: May 4, 2026                           Respectfully submitted,

**FVF Law | Fogelman Von Flattern**

*/s/ Bret Stanley*
Bret Stanley
Texas Bar No. 24075116
3101 Bee Cave Road, Suite 301
Austin, Texas 78746
512-956-4789
512-956-9290 Fax
bret@fvlawfirm.com
Service Email: *eservice@fvlawfirm.com*
Admitted in the Western District of Wisconsin

Attorney for Plaintiff Omar Torres Sulbaran

23